UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FACEMASKCENTER.COM<br><br>- and -<br><br>FOUR FACEBOOK PAGES<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. ____<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## UNITED STATES' VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

COMES NOW, Plaintiff the United States of America (the "United States"), by and through the United States Attorney for the District of Columbia, which brings this verified complaint for forfeiture in a civil action *in rem* against the defendant properties, namely: website, FaceMaskCenter.com ("Defendant Property 1") and Facebook pages, https://www.facebook.com/pg/facemaskcentertr ("Defendant Property 2"), https://www.facebook.com/toptantisort ("Defendant Property 3"), www.facebook.com/pg/toptantayttr/988930137790011 ("Defendant Property 4"), https://www.facebook.com/people/Murat-Çakar/100008437367572 ("Defendant Property 5") (collectively, the "Defendant Properties"); and alleges as follows.

### NATURE OF ACTION AND THE DEFENDANT IN REM

1. This *in rem* forfeiture action arises out of an investigation by Homeland Security Investigations ("HSI"), the Internal Revenue Service, Criminal Investigations ("IRS-CI"), and the Federal Bureau of Investigation ("FBI"). Specifically, the United States is investigating the

unlawful sale of personal protection equipment ("PPE") during the national pandemic, and the related use of such proceeds to support and finance terrorism.

2. The Defendant Properties are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i), as domestic and foreign assets of a designated foreign terrorist organization, the Islamic State of Iraq and the Levant ("ISIS"), which has engaged in planning and perpetrating federal crimes of terrorism as defined in 18 U.S.C. § 2332b(g)(5), against the United States, citizens or residents of the United States, and as foreign assets affording any person a source of influence over any such entity or organization.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

4. Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A).

## FACTS GIVING RISE TO FORFEITURE

### I. BACKGROUND

#### A. ISIS

5. On or about October 15, 2004, the U.S. Secretary of State designated al Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act (the "INA") and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224. On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the INA and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the FTO listing: the Islamic State of Iraq and al-Sham (i.e., "ISIS"—which is how the FTO will be referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan

Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

### B. The Defense Production Act

6. On March 13, 2020, the President of the United States declared a national emergency due to the COVID-19 pandemic.

7. On March 25, 2020, the U.S. Department of Health and Human Services ("HHS") issued "Notice of Designation of Scarce Materials or Threatened Materials Subject to COVID-19 Hoarding Measures Under Executive Order 13910 and Section 102 of the Defense Production Act of 1950." In the notice, HHS designates the following items, among others, as scarce materials:

- N-95 Filtering Facepiece Respirators, including devices that are disposable half-face-piece non-powered air-purifying particulate respirators intended for use to cover the nose and mouth of the wearer to help reduce wearer exposure to pathogenic biological airborne particulates;
- Other Filtering Facepiece Respirators (e.g., those designated as N99, N100, R95, R99, R100, or P95, P99, P100), including single-use, disposable half-mask respiratory protective devices that cover the user's airway (nose and mouth) and offer protection from particulate materials at an N95 filtration efficiency level per 42 CFR 84.181;
- Protective devices that cover the user's airway (nose and mouth) and offer protection from particulate materials at an N95 filtration efficiency level per 42 CFR 84.181;
- Elastomeric, air-purifying respirators and appropriate particulate filters/cartridges;
- Powered Air Purifying Respirator ("PAPR");
- Portable Ventilators, including portable devices intended to mechanically control or assist patient breathing by delivering a predetermined percentage of oxygen in the breathing gas;

. . .

- Medical gowns or apparel, e.g., surgical gowns or isolation gowns;
- Personal protective equipment ("PPE") coveralls, e.g., Tyvek Suits;
- PPE face masks, including any masks that cover the user's nose and mouth and may or may not meet fluid barrier or filtration efficiency levels;
- PPE surgical masks, including masks that covers the user's nose and mouth and provides a physical barrier to fluids and particulate materials;
- PPE face shields, including those defined at 21 CFR 878.4040 and those intended for the same purpose;

. . .

- o Ventilators, anesthesia gas machines modified for use as ventilators, and positive pressure breathing devices modified for use as ventilators (collectively referred to as "ventilators"), ventilator tubing connectors, and ventilator accessories as those terms are described in FDA's March 2020 Enforcement Policy for Ventilators and Accessories and Other Respiratory Devices During the Coronavirus Disease 2019 (COVID-19) Public Health Emergency located at https://www.fda.gov/media/136318/download.

### C.   Fraud Related to the National Pandemic

8.   The Centers for Disease Control and Prevention ("CDC") recommends that people wear cloth face coverings in public settings.  The CDC has further stated that it "does not recommend that the general public wear N95 respirators to protect themselves from respiratory diseases, including coronavirus (COVID-19). Those are critical supplies that must continue to be reserved for health care workers and other medical first responders, as recommended by current CDC guidance."  *See*  https://www.fda.gov/medical-devices/personal-protective-equipment-infection-control/n95-respirators-and-surgical-masks-face-masks.

9.   In response to the current COVID-19 pandemic, N95 respirators are in high demand worldwide and designated as scarce as described above.

10.   DuPont is a U.S. corporation that manufactures items in the field of industry, consumer goods, worker safety, and healthcare.  DuPont manufactures a Tyvek coverall suit, which is used in hospital and hazardous material cleanups.  According to the HHS, "DuPont's Tyvek is a versatile material that can provide a barrier against fine particles and chemicals. These coverall suits are part of the PPE needed for healthcare workers caring for COVID-19 patients. Other recommended PPE include a N95 respirator or surgical/face mask, a face shield or protective eyewear, and gloves."  *See* https://www.hhs.gov/about/news/2020/04/08/hhs-provide-millions-tyvek-protective-suits-us-healthcare-workers.html.

11. Due to the COVID-19 pandemic, there is an acute shortage of DuPont Tyvek suits. Many resellers are out of stock or have limited offerings for sale. The U.S. government has negotiated an agreement with DuPont to deliver Tyvek Suits to the strategic national stockpile ("SNS"). The SNS is coordinating through the Federal Emergency Management Agency to deliver supplies where they are needed most for the COVID-19 response.

### D. Background on Murat Cakar

12. On November 26, 2018, Zoobia Shahnaz pled guilty to providing material support to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B. Specifically, Shanaz sent more than $150,000 to shell companies, including companies in Turkey that were fronts for ISIS, and attempted to travel to Syria to join ISIS.

13. Shanaz used more than a dozen fraudulently obtained credit cards to purchase approximately $62,000 in Bitcoin, which she converted back to fiat currency to send to the shell companies.

14. Financial records reveal that Zoobia Shahnaz sent approximately $100,000 to an alias of Murat Cakar. Money launderers frequently use aliases when collecting funds from different sources.

15. According to a confidential reliable source, Cakar is an ISIS facilitator who is responsible for managing select ISIS hacking operations, including activity involving Defendant Property 1.

### E. Fraudulent sales via Defendant Property 1

16. The scarcity of the above-described PPE has led to numerous fraudulent websites claiming to sell authentic and certified PPE online.

17. Law enforcement, while in Washington, D.C., reviewed Defendant Property 1 and found that this site claims to sell multiple types of facemasks and PPE, including disposable hospital grade face masks, N95 respirator masks, washable facemasks, DuPont Tyvek coverall suits, and gloves. A recent snapshot of the site's homepage is displayed below:



18. On the "About" section of the webpage, Defendant Property 1 states:

> FaceMaskCenter is the original online personal protective equipment supplier and was the first of its kind. Owned and operated by sanitary experts, we pride ourselves on our product knowledge and quality customer service, so you can have safe and seamless online shopping experience. We have come a long way since launching our website in 1996. We started off small and grew our range to cater for everybody's health products needs. We now are serving online with our range of face masks, gloves, goggles, protective suits and thermometers.

19. The claim that the website launched in 1996 is demonstrably false. Publicly-available website registration records revealed that the website was created from an IP address in Turkey on February 26, 2020. Additionally, the site is not "owned and operated" by sanitary experts.

20. The site indicates that it accepts payment by Visa, Mastercard, and PayPal, all of which are U.S.-based financial institutions.

21. Defendant Property 1's section that sells N95 respirators states:

> **NOTE: Not all N95 masks are equal. Most are for industrial use. The N95 respirator offered by FaceMaskCenter is FDA cleared for medical use because it passed stringent fluid resistance testing. This is widely considered critical since airborne viruses transfer as fluid droplets.**
>
> - NIOSH [National Institute of Occupations Safety & Health] approved.
> - FDA cleared.
> - Meets CDC Guidelines for infection control of Flu, SARS, Corona Virus, Tuberculosis, Anthrax, Smallpox and more.
>
> . . .
>
> **This respirator has been evaluated and approved by The National Institute of Occupations Safety & Health (NIOSH) and is cleared by the U.S. Food & Drug Administration (FDA).** This product is a N95 Respirator deemed "Surgical" by the FDA. It is not a Surgical Mask. "Surgical N95 Respirators" undergo more rigorous testing and are designed to both prevent the spread of germs and protect the wearer's respiratory system.

(emphasis in original).

22. A review of the masks purportedly for sale on the site revealed that the masks are produced by a Turkish company. In spite of the Defendant Property 1's above statements, this Turkish manufacturer's respirators are not on the list of FDA/NIOSH approved N-95 respirators.

23. A customer in the United States contacted Defendant Property 1 to purchase N95 masks and other PPE for hospitals, nursing houses, and fire departments.

24. A Syrian national residing in Turkey responded to this request stating that Defendant Property 1 had such products for sale, and that they were certified.

25. The Syrian national stated that he could easily provide up to 100,000 N95 masks, which he claimed to have in his possession.

26.     Defendant Property 1 also advertises the sale of DuPont Tyvek suits.  Whereas other sites have severely restricted the quantity of any such items for sale (in order to prevent hoarding/price gouging on resale) or simply do not have any stock, Defendant Property 1 allows customers to place orders for any desired quantity of such items with no limits.  This is inconsistent with the overall shortage of PPE, to include DuPont Tyvek suits.

### F.     Multiple Cakar Controlled Facebook Pages Promote Defendant Property 1

27.     Defendant Property 1's related Facebook page is Defendant Property 2.  Defendant Property 2's first post was on March 10, 2020, with a photo from Defendant Property 1.  Defendant Property 2 posts multiple images and videos referencing Defendant Property 1 and Defendant Property 2 identifies Defendant Property 1

28.     Cakar, while in Turkey, registered Defendant Property 2.

29.     Cakar also created Defendant Property 3 and Defendant Property 4 which he uses to further the aforementioned PPE scheme.

30.     Since 2015, Defendant Property 3 has primarily advertised the sale of t-shirts. Likewise, since 2014, Defendant Property 4 has also primarily advertised the sale of clothing products.  One common method of money laundering is to claim that the funds were received through a licit business, such as clothing sales.

31.     Law enforcement is aware that individuals who operate fraudulent websites often use other fraudulent companies under their control to advertise for the other sites.

32.     On or about March 17, 2020, Defendant Property 3 and Defendant Property 4 posted an advertisement for Defendant Property 1.  Subsequent to this post, Defendant Property 4 posted two additional advertisements for face masks.

- 9 -

33.     Defendant Property 3 and Defendant Property 4 are linked to Defendant Property 5, which is a Facebook page in Cakar's name.

### COUNT ONE – FORFEITURE
### (18 U.S.C. § 981(A)(1)(G)(i))

34.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 33 above as if fully set forth herein.

35.     ISIS is a designated foreign terrorist organization.

36.     The Defendant Properties are associated with ISIS.

37.     As such, the Defendant Properties are subject to forfeiture to the United States, pursuant to 18 U.S.C. § 981(a)(1)(G)(i), as assets of a foreign terrorist organization engaged in planning or perpetrating any federal crime of terrorism (as defined in section 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property, and as assets affording any person a source of influence over any such entity or organization.

\* \* \*

PRAYER FOR RELIEF

WHEREFORE, the United States prays that notice issue on the Defendant Properties as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring that the Defendant Properties be forfeited to the United States for disposition according to law; and that the United States be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: July 31, 2020
      Washington, D.C.

Respectfully submitted,

MICHAEL R. SHERWIN,
N.Y. Bar Number 4444188
ACTING UNITED STATES ATTORNEY

By:     */s/ Zia Faruqui*
ZIA M. FARUQUI, D.C. Bar No. 494990
JESSICA BROOKS
Assistant United States Attorneys
Fourth Street, NW
Washington, DC 20530
(202) 252-7566 (main line)

and

DANIELLE ROSBOROUGH (D.C. Bar No. 1016234)
Trial Attorney
National Security Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20004
Office: (202) 514-0849 (main line)

*Attorneys for the United States of America*

## **VERIFICATION**

I, Joseph Consavage, a Special Agent with the Homeland Security Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct. Executed on this 31st day of July, 2020.

*/s/  Joseph Consavage*
Special Agent Joseph Consavage,
Homeland Security Investigation

I, Christopher Janczewski, a Special Agent with the Internal Revenue Service-Criminal Investigations, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 31st day of July, 2020.

*/s/  Chris Janczewski*
Special Agent Chris Janczewski, IRS-CI

I, Nicholas Rivers, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 31st day of July, 2020.

*/s/  Nicholas Rivers*
Special Agent Nicholas Rivers
FBI